**VRC** | **VLADECK RASKIN CLARK P.C.**

Susan J. Walsh
(646) 398-1514
swalsh@vladeck.com

December 2, 2025

Hon. Katherine Polk Failla
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York  10007

Re:  *United States v.  Sergio Duarte Frias*, 23 Cr 180 (KPF)

Dear Judge Failla:

## Preliminary Statement

I respectfully submit this sentencing memorandum on behalf of Sergio Duarte Frias who is scheduled to appear for sentencing on December 16, 2025.  I submit that a significant variance from the stipulated guideline range for this young man to the statutory minimum of 60 months incarceration is appropriate.  Sergio is now a 28-year old Mexican national, extradited to this country through Guatemala, who has been a model prisoner - humbled, terrified, isolated and shamed for the past 33 months he has spent incarcerated.  Except for one brief visit from his mother and sister, he has been entirely alone in the MDC.  He has genuinely acknowledged the gravity of his wrong doing, accepted responsibility for the pain he has caused, and committed himself to a law-abiding future.   Rather than an extended guideline term of incarceration, the 60 months mandatory minimum is sufficient but not greater than necessary to satisfy the goals of sentencing in this case.

To be sure, counsel does not seek to undermine the seriousness of the fentanyl crisis nor the savagery alleged in the speaking indictment filed in this case about the Sinaloa cartel and its notorious, familial hierarchy.  Instead, counsel urges this Court to consider a young man born into that part of Mexico not by choice, who like many post-adolescent twenty-year olds, succumbed to the lure of quick money, crypto-currency access, and apparently the outreach of a desperate old friend.  Sergio is a non-violent, capable young man from a decent family who made a life-altering mistake to conspire to move drugs and drug money.  He will never be the same person, having served time in the MDC and when repatriated, will forever look over his shoulder for having been named as a co-conspirator in this most notorious indictment and convicted by the American justice system.

It is my goal to urge this Court to consider the individual and his place in the conspiracy acknowledging that all roles are vital, but that so too is an American justice system that distinguishes the individual and dispenses mercy as readily as it does punishment.

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 2

## Context

> I am really sorry for the crimes I committed [sic].  In this jail I have read and learned about how dangerous and poisonous (how bad and dangerous) the drugs I was involved are [sic] and how much they can hurt people.  I learned how bad my decision was to get involved.  I promise my family, the judge and the USA I won't never [sic] break the law again.  I promised to tell people how terrible these [sic] decision was and warn them never to break the law. It is wrong and not worth it.
>
> (Exhibit A, Defendant's Letter to Court)

There is precious little a defendant can do to distinguish himself and demonstrate to the Court on sentencing day the honesty of their remorse and commitment to rehabilitation.  And it is not an easy task to commit to engage in rehabilitation simultaneously with self-preservation in a pre-trial detention facility plagued with violence, lockdowns, and neglect like the MDC Brooklyn.  But that is what Sergio has done since he was first shackled with leg irons on March 17, 2023 in Guatemala and since arriving in New York in October 2023.  Regrettably ensnared in the criminality for which his hometown has become notorious, since his arrest and for close to three years, Sergio has engaged in his own self-directed rehabilitation.  He has not a single infraction since being incarcerated.[1]  He has read books,[2] worked as an Orderly, taken the few classes made available to him at the MDC,[3] endured relentless "lockdowns" and witnessed horrific violence.  His goal is to repatriate, educate himself and others and never return to the criminality that brought him to the United States.  My request to this Court is to grant him the mercy to be able to do that as soon as the law will allow.

## The Plea

Sergio Duarte Frias pleaded guilty to a Fentanyl Importation Conspiracy, 21 U.S.C.§ 952(a) and Conspiracy to Commit Money Laundering, 18 USC § 1956(h) after acknowledging to this Court his guilt on September 3, 2025.

Without in any way diminishing the seriousness of his conduct, or the gravity of the fentanyl crisis and the violence it fuels, there is no dispute that Sergio was late to join this conspiracy in or around 2022/23 well after it was established and began in 2014.[4]   While the defense does not dispute the Sentencing Guideline calculation in the PSR, we do urge the Court to consider the parties' initial mis-calculation and that stipulation, which placed him in Criminal History Category I with a Total Offense Level 31, resulting in a guideline range of 108 – 135 months as well as probation's advocating a

---

[1]  Presentence Report  ("PSR") at ¶ 8.
[2]   Exhibit, A1 is a list of some of the books Sergio has read since being incarcerated, a list he did not even start to make until after about one year into his pre-trial detention.
[3]   Exhibit A2 are the certificates he has earned and verified in the PSR at ¶ 8.
[4]   PSR at ¶ 2.

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 3

variance to the lowest of that level. Sergio has long recognized his culpability and wished only for a chance to demonstrate to the Government and this Court that he is in fact remorseful, rehabilitated, and worthy of the Court's awesome mercy dispensing power. When the opportunity finally presented itself with the hope to receive a reduced mandatory minimum, he was quick to accept it.

## The Standard

As this Court well knows, section 3553(a) of Title 18 provides that '[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. §3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 562 U.S. 476, 493 (2011). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49, 50 (2007). Rather, the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 50; *see also Beckles v. United States*, 580 U.S. 256, 265 (2017) ("Although the Guidelines remain 'the starting point and the initial benchmark' for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range…") (citing *Gall*, 552 U.S. at 49). The sentencing judge is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). In exercising discretion, "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

Among the factors to be considered under Section 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence of criminal conduct; (C) to protect the public from future crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner." 18 U.S.C. § 3553(a)(2).

## History and Characteristics

As the annexed letters attest, by any measure of his short life, Sergio until the age of 26 lived a humble, unremarkable one, within a traditional working class family in Mexico. His parents and siblings are loving and forgiving of their son and brother and also genuinely stunned and heartbroken by his involvement in narcotics. On behalf of her eldest of three children, Sergio's mother has sent dozens of photographs, diplomas, sports certificates, report cards and achievements beginning with pre-

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 4

kindergarten days until University and ranging from Taekwondo courses to cycling awards[5]. She has sent so many that counsel could fill a scrap book. The hope is to demonstrate what his simple life was like in Mexico, from birth and baptism to university and employment, filled with family holiday photos and complete with captions.[6] She implores the Court to recognize the decency of the family that raised Sergio, but mostly to balance the goodness of his young life against the harshness of his conviction. She writes to this Court,

> "We know he made a mistake. We raised him with values. We do not agree with what he did, and with great pain I ask myself how much longer….
> He is my son. I forgive him with all my heart, because I know with absolute certainty that Sergio would never do it again. He has cried so much because of this situation."
>
> Exhibit B, Letter from Defendant's Mother

Sergio's mother wants this Court to know who her son is, but also importantly sheds light on the extreme conditions he has been living under in a foreign country without family support and in what can be at times the horror of the MDC. "He is currently in a very dangerous place where he has witnessed things he had only ever seen in movies. When he tells me about fights or conflicts there, I worry deeply, because he is experiencing things he never should have lived." ( Exhibit B). Sergio's father, too, shares a similar parental agony writing to the Court on his eldest son's behalf: "On many occasions, I was there, at tournaments or competitions, along with [Sergio's] mother and siblings, supporting him. He is one of my greatest sources of pride, alongside his siblings…He always pushed himself to give his best. The day he was arrested, we could not believe it. No one in the family was able to accept it, we were completely devastated by the news. As parents and as a family, it broke us." (Exhibit C, Letter from Defendant's Father).

This is obviously a family devoted to one another, who also suffers because of their own loved one's terrible judgment. Importantly, they also have experienced public shame in their community, embarrassed, afraid and of course, heart-broken. Sergio's sister describes that the news of her brother's arrest "felt like a lie, or a cruel joke," how the family feels "afraid of people around her….judged, mocked" while their loved one is incarcerated so far from home. (Exhibit D, Letter from Defendant's Sister). Only once has Sergio's mother and sister been able to visit him and only for a single, abbreviated visit at the MDC. Couple with the logistics and the enormous expense of the trip they are now no longer able to manage the costs of their

---

[5] Probation's inability to contact Sergio's mother is perplexing given how regularly and often she texted messages to counsel and in particular the efforts that were made to coordinate her employment schedule to be receptive to a call from probation given the time difference. PSR at ¶ 75. Her cell phone works, as does her email account. The entire family is engaged in sending an enormous volume of photos and certificates in aid of their son and to inform this Court about his nature and background.

[6] A sampling of some of those documents and photos which contain personal and private identifiers are annexed under seal for the Court's consideration. (Exhibit B1, Under Seal)

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 5

education in Mexico, something they have been reluctant to burden Sergio with knowing. (Exhibit D and E, Letter from Siblings). The individual they describe before his arrest still remains, "hardworking," "respectful" and "kind." It is clear that he will have a forgiving, stable family to support his rehabilitation when and if he is permitted to return to them.

It is apparent that Sergio is also no stranger to learning and hard work. While defense counsel is aware that a cynical view may see his family life and upbringing as an aggravating factor given the



opportunities his family tried to provide to him, of course, an individual's history and background must be carefully considered to put the "immediate misconduct …in the context of [the defendant's] overall life hitherto," at the "moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson,* 441 F.Supp.2d 506 at 514 (S.D.N.Y. 2006) (Rakoff, J.).

Sergio has clearly applied himself in school, although it appears as was the case for many, the isolation of the pandemic upended his attendance at university. He did matriculate into University as the letters and photos attest. (Exhibit H). His and his family's hard work to build a modest Mexican Style Chinese Wok restaurant is both a source of pride and disappointment. Having learned both kitchen and cooking skills at a previous job, the family describes coming together to literally build and paint this small restaurant. (Exhibit I).

**<u>Conditions of Confinement</u>**

Whatever the root cause or combination of causes for breakdown in the quality of pre-trial detention conditions at the MDC Brooklyn, there is little room to dispute it as it is now almost routinely and consistently reported by anyone detained therein among other sources.[7] Sadly, while the conditions Sergio suffered while confined from March 17, 2023 until October 30, 2023 in a Guatemalan prison, where he had been lured for arrest and extradition were deplorable, the conditions in Brooklyn are not much better.



The problems that Sergio has witnessed and experienced include routine violence among detainees and between detainees and staff, persistent

---

[7] Michael R. Sisak and Michael Balsamo, *Feds launch 'interagency operation' at troubled NYC jail housing Diddy,* NBC New York (Oct. 28, 2024). https://www.nbcnewyork.colm/brooklyn/feds-launch-interagency-operations-at-nyc-jail_-housing-sean-diddy-combs/5929417/.; See also, Press Release, U.S. Attorney's Office, Eastern District of New York, Ex-Federal Correction Officer Pleads Guilty to Taking Bribes in Exchange for Smuggling Contraband into Federal Jail in Brooklyn (Jan. 11, 2024) https://www.justice.gov/usao-edny/pr/ex-federal-correction-officer-pleads-guilty-taking-bribes-exchange-smuggling-0).

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 6

"lockdowns" in cells (routinely for more than 22 hours per day), a lack of rehabilitative resources and subpar medical care. In fact, the only time Sergio was in the Special Housing Unit ("SHU") normally reserved for administrative punishment/segregation or security was when he and his cell mate requested it during an uncontrolled spate of violence on their unit which they were too terrified to endure.

From the very first months of his incarceration Sergio experienced extended lockdowns incommunicado and without understanding that such conditions, corroborated by Memoranda from the Captains, in some instances are not supposed to be "normal." (Exhibit J, Captain Rodriguez, Memoranda Documenting "Modified Institutional Operations" a/k/a lockdowns).[8] During normal conditions detainees are allowed out of their cells for most of the day (typically 6 am until 4 pm count) and then after the count until about 9 pm) where they can shower, congregate, call or email family and engage in programing and discovery review. That has not been the regular status since the extreme lockdowns which began during the COVID-19 pandemic. To this day, as recently as last month, lockdowns where detainees are confined to their cells for 22 hours or more per day, have become routine.

In December 2023, not long after Sergio's arrival at the MDC, a two-week lock-down was "relaxed" allowing detainees two hours per day out of their cells, only to be followed by another just days later, which was not lifted until January 2024. Not long thereafter, another lockdown was announced by Captain Rodriguez, following an assault on staff March 21, 2024 (Exhibit J, supra). By my client's count, there has rarely been a single month since he was incarcerated in the MDC that there has not been a lockdown. The approximate living space for two people in a single cell, excluding the exposed toilet, but including the bunkbed is roughly 80 square feet. Even the MDC staff recognize the inhumanity and the dangers these extended periods of extreme confinement create for both detainees and staff, increasing the risk of heightened stress, anxiety and of course, violence.[9] A vicious cycle of violence and lockdown and the constant anxiety of when the next lockdown cycle might begin, is isolating, nerve wracking and as one Judge put it, "tantamount to solitary or near-solitary confinement." [10] In his case

---

[8] As one Judge in this District observed; "In Orwellian fashion, the Bureau of Prisons does not refer to these periods as 'lockdowns'; instead it refers to them as 'modified operation.'" *United States v. Chavez*, No. 22-Cr 303(JMF), 2024 WL 50233, at 1 n. 4 (S.D.N.Y. Jan 4, 2024).

[9] Memorandum re Unsafe Working Conditions from Rhonda Barnwell, AFGE Local 2005 President, to Bureau of Prisons Regional Director Amy Boncer, (June 23, 2023) at 3, *United States v. Irizarry*, No. 23 Cr 60 (JMF) (S.D.N.Y. Oct. 30, 2023), ECF No. 47-3.

[10] See, *United States v. Chavez*, No. 22 Cr-303 (JMF), 2024 WL 50233, at * 5 (S.D.N.Y. Jan. 4, 2024); *see also*, Boxed In: The True Cost of Extreme Isolation in New York's Prisons, New York Civil Liberties Union, (Oct. 12, 2012)
https://www.nyclu.org/sites/default/files/publciations/nycle_boxedin_FINA.pdf(Finding "extreme isolation causes emotional and psychological harm, inducing apathy, lethargy, anxiety, depression, despair, rage and uncontrollable impulse, even among the healthy and mentally stable."

since Sergio has had only one social visit since March 2023, the isolation has been even more extreme for him.

Of course, Sergio takes full responsibility for where he has found himself, but consideration of the isolation, loneliness, and mental anguish is important to take into account in terms of the punishment he has received as a result of this arrest, extradition and conviction. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012) (quoting the district court's observation that 'sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account [] for the wrong that they committed").

Before the pandemic, model detainees like Sergio frequently collected dozens of certificates confirming their efforts toward staying engaged, learning and working toward rehabilitation. Now, a prisoner without a single infraction like Sergio struggles to access two programs.[11] Instead, he engages in his own reading list, practices his English and despite his "anxiety and depression" has "never lost hope" for a second chance at life as he describe it to the Court. (Exhibit A).

This Court is "required, as a procedural matter, to consider evidence" of rehabilitation in deciding what sentence to impose, and Sergio's actions since his arrest as well as his words demonstrate that his remorse is genuine, and his rehabilitation commenced when he started to compile a reading list of his own and, sought out classes and employment while incarcerated. *United States v Preacely*, 628 F.3d 72, 81 (2d Cir. 2010); *See, e.g. United States v. Williams*, 65 F.3d 301, 305 (2d Cir. 1995) (approving extraordinary rehabilitation as permissible grounds for departure). His commitment to work, to humbling himself to do what he can, and to remain engaged demonstrates his contrition as well as his ability to contribute positively and meaningfully to society which "provides the most up-to-date picture of his history and characteristics," *Pepper*, 562 U.S. at 492 (internal citations removed). Sergio has not only expressed his guilt publicly to this Court, but privately to those most precious in his life, his parents and siblings.

### Deterrence

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, prosecutors consistently argue the factor of general deterrence in support of guideline sentences. The troubling aspect of this is that it is wrong and has led to mass incarceration. [12]

---

[11] PSR at ¶ 8.
[12] *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015).

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 8

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime.[13] Kleck and Barnes' study concludes that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent." *Id*. at 1031. Indeed, the United States Department of Justice at one point agreed with the conclusion that incarcerating defendants is not an effective means of deterrence.[14] In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. S*ee id*.

As in the case of general deterrence, empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime[15]. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than non-custodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is compelling evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism.[16]

**Conclusion**

Finally, although in his mid-twenties at the time he became entangled in this criminal conspiracy, Sergio's relative youth provides mitigation as well as hope that his risk of recidivism is more remote with each passing day. Neuroscientists are virtually uniform in concluding that the human brain is not fully developed until an individual has reached his or her mid-20's.[17] More slowly, the law has also acknowledged, that poor decision making can in part be explained because the human brain that involves "behavior control continues to mature through late adolescence." *Graham v. Florida*, 560 U.S. 48, 68 (2011)(holding that the Eighth amendment prohibits life without parole for juveniles). As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility;'" they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure…" and of course, are risk takers. *Id.,* quoting *Roper v. Simmons*, 453 U.S 551 (2005). But just as surely as his youth contributed to his extremely poor judgment, it also bodes well for his reform through his maturation.

---

[13] *See id*; *see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013).

[14] *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit K

[15] *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit L.

[16] *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data* 1974-2002, 6 Criminology & Public Policy 589 (2007).

[17] *See* Arian, M.; Haque, M.; Johal L.; Mathur, P.; Nel W.; Rais, A.; Sandhu, R. & Sharma, S., *Maturation of the Adolescent Brain*, 9 Neuropsych. Dis. Treat., 441 (2013); Johnson, S.B.; Blum, R.W. & Giedd, J.N., Adolescent Maturity and the *Brain*: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy,45(3) J. Adolesc. Health 216 (2009).

Hon. Katherine P. Failla
United States District Court Judge
December 2, 2025
-page- 9

  Of course, at the end of any sentence Sergio faces deportation out of the United States. His status, indeed the status of many non-citizens detained in this country presently is a real continuing source of anxiety, particularly as it relates to his eligibility for programs, lower security confinement in the BOP and ultimately, where he will be deported upon completion of the time he serves for his crime.

  For the above reasons, I respectfully request that this Court spare Sergio time incarcerated beyond the statutory minimum but instead recognize his potential to rehabilitate, his remorse and that 60 months in any prison for a first-time non-violent offender is enough isolation to satisfy all of the goals of sentencing.

  Thank you for your time and consideration.

            Respectfully submitted,


            */s/* Susan J. Walsh
            Attorney for Sergio Duarte Frias