

*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278*

December 9, 2025

**BY ECF**

The Honorable Katherine P. Failla
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Sergio Duarte Frias*, 23 Cr. 180 (KPF)

Dear Judge Failla:

      The Government respectfully submits this letter in advance of the December 16, 2025 sentencing of defendant Sergio Duarte Frias following his guilty plea to conspiring to import fentanyl and conspiring to commit money laundering. For the reasons set forth below, the Government respectfully submits that a sentence within the range calculated and stipulated to by the parties under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"), of 108 to 135 months' imprisonment (the "Stipulated Guidelines Range"), would be sufficient but not greater than necessary to achieve the purposes of sentencing.

**I.    Offense Conduct**

      With his co-defendant Mario Alberto Jimenez Castro, the defendant operated a money laundering organization that used cryptocurrency to launder significant drug proceeds belonging to the Sinaloa Cartel from the United States to Mexico. Presentence Investigation Report ("PSR") ¶ 25. The defendant and Jiminez Castro reported to a deputy of Ivan Archivaldo Guzman Salazar, one of the sons of the Cartel's former leader, Joaquin Archivaldo Guzman Loera, a/k/a "El Chapo." Collectively known as the Chapitos, Guzman Loera's sons were responsible for leading the Cartel's operations in producing and distributing fentanyl. PSR ¶ 29. As part of this scheme, the defendant and Jimenez Castro directed individuals, including a confidential source working at the direction of U.S. law enforcement (the "CS"), to pick up drug proceeds from various traffickers in the United States and to then deposit the cash into cryptocurrency wallets controlled by the defendant and other high-level associates. For example, based on instructions from the defendant, the CS engaged in multiple bulk money pickups of drug proceeds ranging from $33,990 to $150,400 U.S. dollars, which the CS then deposited into a cryptocurrency wallet subscribed in the defendant's name. The cryptocurrency would then be converted into regular currency for withdrawal by the defendant, Jimenez Castro, or their associates, after which the currency would be sent to Mexico. Over the course of approximately three months alone—from August 25, 2022,

through December 5, 2022—the defendant and Jimenez Castro repatriated a total of approximately $869,000 U.S. dollars in narcotics proceeds using cryptocurrency. PSR ¶ 30.

In addition to money laundering, the defendant personally distributed the Sinaloa Cartel's fentanyl: for example, on January 27, 2023, he sold to an undercover law enforcement agent (the "UC") approximately 10,000 fentanyl pills and one kilogram of fentanyl through a courier at a parking lot located in the vicinity of Burbank, California. PSR ¶ 35. In the course of negotiating that drug transaction, the defendant agreed with the UC that the UC could pay the defendant for the drugs in automatic weapons, including AK-47s and AR-15s. PSR ¶ 31.

On February 20, 2023, the defendant and his partner spoke with the UC on a recorded phone call regarding the January 27, 2023 fentanyl sale and to start negotiations for a future, larger fentanyl deal. On that call, the defendant's partner confirmed that the fentanyl that had been sold to the UC was from Sinaloa and, with the defendant, discussed pricing for future transactions with the UC. The defendant and his partner expressed willingness to sell the UC another 10 kilograms of fentanyl powder and explained that $14,000 per kilogram was the best price they could offer at that volume. The UC explained that the intended destination of the fentanyl was New York City, and the defendant told the UC to reach out when the UC's associate was ready for more deliveries, promising to quickly provide additional fentanyl. PSR ¶ 37.

## II.  Procedural History and Guidelines Calculations

On April 4, 2023, the defendant was charged in five counts of a six-count indictment, including with (1) participating in a conspiracy from at least in or about 2014, up to and including on or about April 4, 2023, to (i) import 400 grams and more of fentanyl into the United States, (ii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, and (iii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl on board an aircraft registered in the United States, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(F) (Count Two); and (2) participating in a money laundering conspiracy, from at least in or about 2014 up to and including on or about April 4, 2023, in violation of Title 18, United States Code, Section 1956(h), with the following four objects: promotional money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); international promotional money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A); and international concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) (Count Six).

On March 17, 2023, the defendant, a Mexican citizen, was arrested in Guatemala. PSR at 2, ¶ 41. On October 30, 2023, the defendant was extradited to the United States, PSR ¶ 41, where he has been detained ever since.

On September 3, 2025, pursuant to a plea agreement with the Government (the "Plea Agreement"), the defendant pled guilty before this Court to a lesser included offense of Count Two—participating in a conspiracy to import 40 grams of fentanyl mixtures—and to the money laundering conspiracy charged in Count Six. PSR ¶ 1. The lesser-included fentanyl importation

Case 1:23-cr-00180-KPF   Document 270   Filed 12/09/25   Page 3 of 7

Page 3

offense carries a five-year mandatory minimum term of imprisonment.

The Plea Agreement between the parties stipulated to a total offense level of 31, with a Stipulated Guidelines Range of 108 to 135 months' imprisonment. PSR ¶ 94. The U.S. Probation Office ("Probation") notes that the Plea Agreement erroneously calculated a total offense level of 31, rather than 33, because it did not apply U.S.S.G. § 2S1.1(a)(1). PSR ¶ 94. Pursuant to the Plea Agreement, however, the Government is seeking a sentence within the Stipulated Guidelines Range.

The PSR calculates the Guidelines range as follows:

As explained in Application Note 6 of § 2S1.1, in a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived—which is true in the instant case—the counts shall be grouped pursuant to U.S.S.G. § 3D1.2(c). PSR ¶ 52. Accordingly, because the defendant was convicted of participating both in a money laundering conspiracy and in the fentanyl importation conspiracy from which the laundered funds were derived, Counts Two and Six are grouped. PSR ¶ 52. Pursuant to U.S.S.G. § 3D1.3(a), the highest offense level of the count in the group applies, which here is the offense level derived from Count Six. PSR ¶ 52.

The Guideline for a violation of 18 U.S.C. § 1956(h) is U.S.S.G. § 2S1.1. PSR ¶ 53. Pursuant to § 2S1.1(a)(1), the base offense level is the offense level for the underlying offense from which the laundered funds were derived, if the defendant committed the underlying offense, and the offense level for that offense can be determined. PSR ¶ 53. As the defendant committed the underlying offense of drug-trafficking and that offense level can be determined, U.S.S.G. § 2D1.1 applies. Because the defendant is responsible for distributing at least 1.2 kilograms but less than 4 kilograms of fentanyl, the base offense level is 32, pursuant to U.S.S.G. §§ 2D1.1(a)(5) and (c)(4). PSR ¶ 53. A two-level increase is warranted because a dangerous weapon was possessed, pursuant to U.S.S.G. § 2D1.1(b)(1). PSR ¶ 53.

As the defendant has been convicted under 18 U.S.C. § 1956, two levels are added, pursuant to U.S.S.G. § 2S1.1(b)(2)(B). PSR ¶ 54. The defendant has demonstrated acceptance of responsibility for the offense and thus the offense level is decreased by two levels, pursuant to U.S.S.G. § 3E1.1(a); and because the defendant timely notified authorities of his intention to enter a plea of guilty the offense level is decreased by one additional level, pursuant to U.S.S.G. § 3E1.1(b). PSR ¶¶ 61-62.

In accordance with the above, Probation calculated an offense level of 33 and a Guidelines range of 135 to 168 months' imprisonment, a minimum term of four years' supervised release on Count Two, and a maximum term of three years' supervised release on Count Six ("Probation's Guidelines Range"). Probation recommends a sentence of 108 months' imprisonment on each count to run concurrently, followed by four years of supervised release for Count Two and three years of supervised release for Count Six, with each term of supervised release to run concurrently. PSR at 24.

Pursuant to the Plea Agreement, the defendant also agreed to forfeit to the United States $869,000.

## III. Relative Culpability

The defendant is one of 23 defendants charged in the same Indictment. Of the 23 defendants, seven have been apprehended and are currently in U.S. custody on the charges against them in this case; 13 remain at large, including two of the Chapitos and one of their top lieutenants; and three have been killed in Mexico. Of the 23 defendants, this defendant is among the least culpable, based on his relative role within the Sinaloa Cartel; moreover, unlike many of the defendants charged in this case, this defendant, to the Government's knowledge, was not involved in specific acts of violence. Thus, unlike the Chapitos and their top lieutenants, for example, this defendant is not charged in Count One of the Indictment, which charges five of the defendants with participating in a continuing criminal enterprise, from at least in or about 2014, to at least on or about April 4, 2023, in violation of Title 21, United States Code, Section 848, based on those defendants' roles as principal administrators, organizers, and leaders of the Sinaloa Cartel.

## IV. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
　　(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
　　(B) to afford adequate deterrence to criminal conduct;
　　(C) to protect the public from further crimes of the defendant; and
　　(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [in the Guidelines];

    (5) any pertinent policy statement [issued by the Sentencing Commission];
    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B. A Sentence Within the Stipulated Guidelines Range Is Warranted

A sentence within the Stipulated Guidelines Range of 108 to 131 months' imprisonment would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

The seriousness of the defendant's conduct warrants a substantial term of imprisonment within the Stipulated Guidelines Range. The defendant and his partner, Jimenez Castro, played an important role in the Sinaloa Cartel's massive fentanyl enterprise by using cryptocurrency to launder drug proceeds from the United States to Mexico. The fact that the defendant repatriated almost a million dollars of drug proceeds in just three months speaks to the defendant's relative importance within the sophisticated fentanyl distribution network operated by the Sinaloa Cartel. The Cartel's destructive and far-ranging drug trafficking operations could not exist without the active assistance of associates like the defendant, who leveraged his knowledge and skills to keep money flowing into the Cartel's coffers.

As the Court is aware, fentanyl is a particularly dangerous substance, where even small amounts can prove to be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[1] The crisis has only worsened. According

---

[1] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text=Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can wreak[] havoc on entire communities . . . [and] destroy[] lives.").

to the CDC, in 2023—when the defendant was trafficking fentanyl—for the first time in U.S. history, the overdose death rate topped 112,000 in a 12 month period, with young people and people of color among the hardest hit.[2] The magnitude of this calamity now appears to have eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[3] The cost to ordinary families destroyed by the fentanyl crisis is incalculable. The defendant contributed to that crisis for his personal gain.

The defendant's conduct was not confined to moving and concealing illicit proceeds. As his communications and dealings with the UC reveal, he sold a significant quantity of drugs and confirmed his willingness to sell far more. In 2023, the defendant provided the UC with one kilogram and 10,000 pills of fentanyl and also discussed distributing as much as 10 additional kilograms of fentanyl to the UC. In these conversations, the defendant was explicit about the fact that he had access to and could rapidly provide more fentanyl. The communications and this particular transaction make clear that the defendant was not just a money launderer for the Cartel; he was an active participant in the drug side of the operations and had no qualms about personally flooding the United States with fentanyl.

Further contributing to the defendant's culpability is that the defendant specifically expressed his willingness to the UC to be paid for the fentanyl with automatic weapons. Given the defendant's work for the Sinaloa Cartel as part of the violent fentanyl trade, the defendant without question understood that firearms were part of the Cartel's drug trafficking business, but this particular discussion underscores the defendant's personal willingness to be paid with dangerous weapons in exchange for dangerous drugs.

Finally, the quantity of funds the defendant laundered in a short period of time and the quantity of the fentanyl that the defendant was able to quickly obtain for and sell to the UC together demonstrate the danger the defendant poses as a deeply embedded player in the Cartel's operations and calls for a sentence that deters him from further criminal conduct. In his sentencing submission, the defendant argues against the effectiveness of prison sentences in achieving general deterrence. The Government does not agree. General deterrence plays a meaningful role here, as the defendant's sentence will undoubtedly send the message that, when drug traffickers and money launderers are apprehended by U.S. authorities and brought to justice in the U.S. judicial system, substantial penalties will follow. Moreover, a substantial prison sentence is fully justified for the purpose of achieving specific deterrence in this case. The defense alludes to the pull of the fentanyl trade in the defendant's hometown, and the defendant likely will be deported to his home country when he is released. A substantial term of imprisonment within the Stipulated Guidelines Range is necessary to adequately deter the defendant from recommencing his illegal activities.

---

[2] Brian Mann & Aneri Pattani, In 2023 Fentanyl Overdoses Ravaged the U.S. and Fueled a New Culture War Fight, Nat'l Pub. Radio, Dec. 28, 2023, https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction (last visited December 9, 2025).

[3] *Id.*

The defendant does not deny the seriousness of his conduct but requests a sentence of 60 months based on, among other things, his commitment to rehabilitation and his conditions of confinement. *See* Def. Br. 2, 5-7. The Government recognizes that these factors warrant consideration, but they do not warrant the significant variance requested by the defendant.

## V. Conclusion

For the reasons set forth above, a sentence within the Stipulated Guidelines Range of 108 to 135 months' imprisonment would be sufficient but not greater than necessary in this case to meet the goals of sentencing under Section 3553(a).[4]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: __/s/_____
Nicholas Bradley/Jane Chong
Sarah Kushner/David Robles
Assistant United States Attorneys
(212) 637-2263

cc: Susan J. Walsh, Esq.

---

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).